IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JOSE TORRES, GUADALUPE CLEMENTE, LUZ WALKER, CHRISTINA BEITER, and ANTONIO CARMONA, | ) ) ) ) | |
| | ) | |
| Individually and on behalf of all others similarly situated, | ) ) | |
| | ) | Case No.:  4:12-cv-02373 CDP |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| SIMPATICO, INC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**I.  Introduction**

This is a putative class action brought by Unit Franchisees of the Stratus Building Solution franchise system (the "system").  Defendants include the Franchisor, the Master Franchisees, and various individuals who owned and controlled the System.  Through the scheme described in Plaintiffs' Petition, Defendants fraudulently induced all members of the putative class to purchase cleaning franchises and, thereafter, exploit their control and economic power in order to extract exorbitant fees while failing to fulfill the obligations under the franchise agreement.  When all the layers of this rotten onion are peeled away, all that is left is the blatant fraud, which is the bedrock of this System.

Plaintiffs have brought this action in two counts. Count I seeks recovery under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and alleges that the Stratus Systems, including the Franchisor and each of the current & former Master Franchisees constitute an association-in-fact enterprise under 18 U.S.C. §1961(4).  Count II seeks recovery under RICO and alleges a conspiracy among the Defendants.  Defendants have filed their Motion to Dismiss.  In opposition to that motion, Plaintiffs submit this Memorandum of Law.

## II.  Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Zutz v. Nelson, 601F3d 842, 848(8th Cir 2010); quoting Bell All. Corp v Twombly, 550 US 544, 570, 127 S. Ct. 1955167 L. Ed. 2d 929 (2007).*  Factual allegations must be enough to raise a right to relief above the speculative level.  *Twombly, 127 S. Ct. at 1965.*  "Rule 12(b)(6) does not countenance…dismissals based on a judges disbelief of a complaints factual allegations." *Id; quoting Neitzke v Williams, 490 us 319,327, 109 S. Ct. 1827, 104 L.Ed. 2d 338 (1989).* "A well plead complaint may proceed even if it appears 'that a recovery is very remote or unlikely.'" *Twombly 127 S. Ct. at 1965; quoting scheuer v Rhocles, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L.Ed. 2d 90 (1974).*

Defendants portray Plaintiffs' complaint as consisting of scattered, incoherent factual allegations.  However, a careful reading of all factual allegations contained in the complaint reveals a franchise system that was built upon a web of intentional fraud and deceit which, if accepted as true, constitute wire and mail fraud.

### III.  Facts

Prior to April of 2004, Defendant Simpatico, Inc., operated as a Master Franchisee of Jan-Pro Franchising International, Inc. ("Jan-Pro"). **Complaint, ¶196.**   As a master franchisee, Simpatico, sold unit franchisees of Jan-Pro in a defined geographic area.  In April of 2004, Simpatico disaffiliated itself from Jan-Pro and began operating under the name of Stratus Building Solutions. **¶198** The franchise systems used by Simpatico was identical in all respects to the Jan-Pro systems.

The Stratus System marketed a concept in which individuals could purchase a "Stratus Building Solutions" franchise and set up their own business with extensive assistance from Simpatico. **¶205.** Simpatico have several franchise levels for purchase.  The bigger the franchise fee, the more accounts "guaranteed" by Simpatico.  However, Simpatico would offer accounts that provided little to no profit to the franchisees or required the franchisee to travel long distances to service the account.  Simpatico undertook such actions to force its franchisees to reject or quit accounts which, in turn, relieved Simpatico of its obligations under the franchise agreements. **¶¶ 211-212**

In 2006, Stratus Franchising, LLC began operation.  The purpose of Stratus Franchising was to sell Master Franchises. **¶218.** Master Franchisees were granted a license to use the Stratus marks and sell Unit Franchises in a specified geographic area.  Simpatico became a Master Franchisee of Stratus Franchising, LLC.  The benefit of a Master Franchise is that it permits nationwide sales of Unit Franchises in the "System" without the need for the Franchisor to have direct employees scattered around the country.  It also provides protection for the Franchisor from Unit Franchisees' claims of fraud and breach of contract by adding the layer of Master Franchisees.  **¶ 229.**

Stratus Franchising, LLC, used fraudulent misrepresentations to advance its business from the start.  The Federal Trade Commission ("FTC") requires franchisors to provide a Franchise Disclosure Document ("FDD") to prospective franchisees.  The FTC requires certain disclosures of information to potential investors through the FDD.  In Item 1 of the FDD provided to potential Master Franchisees makes it appear as if Simpatico, Inc began operation in 2004.  However, Stratus Franchising fails to inform the potential Master Franchisees that, in reality, Simpatico, Inc., was formerly a Master Franchisee of its competitor, Jan-Pro.  That omission is not insignificant.  It allowed Stratus Franchising to make it appear that its corporate owned Master Franchises grew much quicker than it actually did.  Potential Master Franchisees utilized that information in their decision to invest anywhere from $100,000 to over $1 Million dollars for the right to sell Stratus Unit Franchises.

In the Stratus Franchising FDD, a representation is made that Dennis Jarrett, the chief executive officer, was formerly the President of Jan-Pro.  However, that is a blatant lie intended to induce the potential Master Franchisee to purchase a Master Franchise.  Finally, Stratus Franchising made unsubstantiated earnings claims to the potential Master Franchisees in violation of FTC regulations.  The Master Franchisees in the Stratus system were all experienced, sophisticated investors.  Many had senior-level executive experience in large corporations before they purchased a Stratus Master Franchise.  Stratus Franchising intentionally defrauded these investors because it knew if the true nature of the business was exposed, it would not be able to sell Master Franchises at such a high premium.  It is very important to note that these allegations, which must be taken as true for purposes of deciding the Motion to Dismiss, come not from Plaintiffs but from Master Franchisees.

Once the potential investor purchased a Master Franchise, he or she quickly discovered that the economic matrices they had been given were false.  The Master Franchisees discovered that in order to survive they had to sell as many Unit Franchises as possible. **¶¶ 234-235.**  The profit margins for the actual cleaning accounts were so low, and the janitorial business was so competitive, that the Master Franchisee could not count on residual income of those cleaning accounts as operating income.  Master Franchisees sold Unit Franchises knowing that there was an insufficient number of cleaning accounts to offer to the new Unit Franchisees.  The Master Franchisees perpetuated a system of "churning."  Churning simply means that the Master Franchisee would find any reason to remove an existing Unit Franchisee rom an account simply to allow the Master Franchisee to give the account to a new Unit Franchisee.  The churning allowed the Master Franchisee to technically comply with the "guarantee" in the franchise agreement.  The result of this whole sham was that many Unit Franchisees who had invested their entire life savings, lost everything.  **¶¶ 234-236.**

At its inception, the Stratus system targeted immigrants, minorities, and those in the lower-socio economic sector.  Stratus knew that these individuals were willing to invest in their own futures and would do work that most of us deplore.  Stratus advertised heavily in the Bosnian and Hispanic press in the native language of its targets.  Yet when a potential Unit Franchisee was given an FDD and Franchise Agreement, it was always in English.  The overall Stratus system exploited the Unit Franchisees.  They became nothing more than chattel and were disregarded once they signed the franchise agreement.

Defendants clearly have a fundamental misunderstanding of the claims being advanced by Plaintiffs.  Plaintiffs are alleging that the Stratus system has always been fraud.  The losses of the Plaintiffs and the putative class can be directly traced back to the national syndication of the

Stratus system. The wire fraud and mail fraud perpetrated against the Master Franchisees allowed this fraudulent system to grow beyond the St. Louis metropolitan area.  The Master Franchisees continued to perpetrate the fraud as a means of self-preservation.

Defendant counted on the lack of power of the Unit Franchisees to continue the Stratus system.  However, once the Unit Franchisees began to unify, they were able to start chipping away at the foundation of the System.  The lies contained in the FDD given to Master Franchisees were exposed.  As a result, many Master Franchisees were forced to face the true nature of the system.  Many left the Stratus system and began directly competing with Stratus. Another is embroiled in contentious litigation in which the allegations first brought to light by the Unit Franchisees are a core issue.

It is vital to understand the structure of the Stratus system prior to analyzing the causes of action advanced by Plaintiffs.

### III.  Argument

#### A.    *Bridge, et al., v. Phoenix Bond & Indemnity Co., et al.*

As many of Defendants' arguments challenge the reliance on the fraud by Plaintiffs, the analysis must begin with a review of the U.S. Supreme Court's decision in *Bridge, et al. v. Phoenix Bond & Indemnity,Co., et al., 126 S. Ct. 2131 (2008)*, a case notably absent from Defendants Motion.  In that case, the Supreme Court specifically addressed whether a Plaintiff asserting a RICO claim predicated on mail fraud must plead and prove that it relied on the Defendants' alleged misrepresentations.  The Court held that a showing of first-party reliance was not required. *Id. at 2145.*

The *Phoenix* case involved the auction of tax liens in Cook County, Illinois.  In order to make the highly-competitive process fair, the assessor required that, upon registering for an

auction, a bidder had to submit a sworn affidavit that stated the bidder would submit bids in its own name and not use agents, employees, or related entities to submit simultaneous bids for the same parcel.  Plaintiffs sued Defendants alleging that Defendants violated the restriction on simultaneous bidding.  Plaintiffs alleged that Defendants violated and conspired to violate RICO by conducting their affairs through a pattern of racketeering activity involving numerous acts of mail fraud.  Specifically, Plaintiffs allege Defendants committed mail fraud when it sent notices to property owners required by Illinois law.

The District Court dismissed the RICO claims for lack of standing.  The District Court found that Plaintiffs were not recipients of the alleged misrepresentation and, at best, were indirect victims of the fraud.  *Id. at 2136.*  The Seventh Circuit Court of Appeals reversed finding that "standing is not a problem in this suit" because Plaintiffs suffered a "real injury" when they lost the valuable chance to acquire more liens and because "that injury can be redressed by damages." *Id. at 2136.*   The Seventh Circuit stated, "A scheme that injures D by making false statements through the mail to E is mail fraud, and actionable by D through RICO if the injury is not derivative of someone else's. *Id. at 2137.*

The Supreme Court granted certiorari to resolve a conflict among the Circuits on the substantive question of whether first party reliance is an element of a civil RICO claim predicated on mail fraud.  The following paragraph is a concise explanation by the Court as to an actionable RICO claim:

> "The upshot is that RICO provides a private right of action for treble damages to any
> person injured in his business or property by reason of the conduct of a qualifying
> enterprise's affairs through a pattern of acts indictable as mail fraud.  Mail fraud, in
> turn, occurs whenever a person, 'having devised or intending to devise any scheme or

artifice to defraud' uses the mail 'for the purpose of executing such scheme or artifice or attempting so to do.' §1341.  The gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element.' *Schnuck v United States, 489 U.S. 705, 712, 109 S. Ct. 1443, 103 L.Ed. 2d 734 (1989). (Citation and internal quotations marks omitted)*, even though the mailing itself 'contain(s) no false information.' *Id.; at 715, 109 S. Ct. 1443.*"  *Id. at 2138.*

The Court found that once the statutory provisions were understood, Plaintiffs' theory of the case was straightforward.  Plaintiff alleged that Defendants devised a scheme to defraud when they agreed to submit false attestations to the assessor.  Defendants used the mail to further the scheme by sending the required notices to the property owners.  Each of the notices was "an act which is indictable" as mail fraud, and together they constituted a "pattern of racketeering activity."  *Id.*  As a result, Plaintiffs were injured in that they lost the opportunity to acquire valuable liens which allowed RICO's plain terms to give them a private cause of action for treble damages. *Id.*

The Supreme Court rejected Defendants' argument that reliance by the Plaintiff was an element of RICO.  The Court stated: "Congress chose to make mail fraud, not common-law fraud, the predicate act for a RICO violation and the mere fact that the predicate acts underlying a particular RICO violation happen to be fraud offenses does not mean that reliance, an element of common-law fraud, is also incorporated as an element of a civil RICO claim. *Id. at 2141, citing Anza v Ideal Steel Supply Corp., 547 U.S. 415, 126 S. Ct. 1991, 164 L. Ed. 720 (2006).*

Finally, the Supreme Court rejected Defendants' argument that Plaintiffs could not satisfy the proximate cause requirement unless he can establish that his injuries resulted from his

reliance on the Defendants fraudulent misrepresentations. *Id. at 2141*. The Court identified two flaws in that argument.  First, the predicate act for RICO is not common-law fraud.  Having rejected Defendants' argument that reliance was not an element of a civil RICO claims, based on mail fraud, the Court saw no reason to let that argument in through a "back door."  *Id. at 2142*.

Second, the Court stated that while first party reliance is an element of a common-law fraud claim, there is no general common-law principal holding that a fraudulent misrepresentation can cause legal injury only to those who rely on it.  The Court voted that the Restatement (Second) of Torts only provides that Plaintiff's loss must be a foreseeable result of someone's reliance on the misrepresentation.  *Id. at 2143*.  The loss of the right of Plaintiffs to obtain valuable liens was the direct result of the fraud and was foreseeable.  *Id.*

In this case, Plaintiffs are not required to show that they relied on any of the misrepresentations set forth in the Complaint.  Plaintiffs only need to show that there was, or is, the scheme to defraud, and that the mails or wires were used as an essential part of the scheme.  Any mailing that is incident to an essential part of the scheme satisfies the mailing element.  As far as proximate cause, the inquiry should be whether it was foreseeable that the alleged misrepresentations would cause harm to the Plaintiffs and the putative class.  The answer is a resounding "yes."  As Stratus Franchising was misrepresenting the System to the Master Franchisees, it was certainly foreseeable that its fraudulent system would spread and ultimately harm the Class.  Likewise, as Stratus Franchising and the Master Franchises acted in concert to misrepresent the Stratus system, it was foreseeable that the putative class would be harmed.

**B.  Plaintiffs have stated the allegations of fraud with particularity.**

Defendants make the broad allegation that Plaintiffs have failed to state the allegations of fraud with particularity.  However, Defendants have failed to address numerous factual

allegations set forth in the Complaint that specifically address their fraudulent activity.

Paragraphs 208 through 215 of the Complaint set forth allegations as to the misrepresentations

made by Simpatico at the beginning of the scheme and contain specific factual allegations about

churning accounts.  :

   208. Prospective franchisees were offered several potential franchise plans they could purchase.  The amount of projected annual revenue promised to the franchisee depended on the amount of the initial franchise fee.  For example, an initial franchise fee of $3,000.00 would result in accounts with projected revenue of $6,000.00; an initial franchise fee of $10,000.00 would result in accounts with projected revenue of $24,000.00.  (The various Franchise Plans are set forth in Exhibit "4" attached hereto).

   209. Pursuant to the Franchise Agreements set forth in the attached Exhibits, Franchisor was given 180 days from the date Franchisee completed training to offer accounts to satisfy the projected revenue plan purchased.

   210. The Franchise Agreements further provide that Franchisor's obligations to provide accounts to Franchisee sufficient to satisfy the projected revenue is deemed fulfilled if the Franchisee rejects any customer accounts offered by Franchisor or if the Franchisee discontinues providing services in any such account.

   211. Defendant Simpatico would routinely offer Franchisees accounts which required traveling a long distance, accounts bid so low that the franchisee would be unable to generate a profit, and/or accounts which were great distances from other accounts the Franchisee was servicing.  By undertaking these actions, Defendant Simpatico was assured that the Franchisee would either decline an account or quit the account after discovering that there was no profit for the Franchisee which, in turn, would relieve Defendant Simpatico of its obligations to provide a certain level of revenue as set forth in the Franchise Agreements.

   212. Once the Franchisee refused an account or quit an account, the Franchisee was at the mercy of the Franchisor to offer it additional accounts.  Franchisor considered it a "moral" issue instead of a "legal" issue because it had no further legal obligation to the Franchisee.

   213. Another tactic used by Defendant Simpatico was to inform a Franchisee that the Franchisor had received customer complaints or that the customer had requested a change of the individuals providing service to the accounts.   In many instances, the Franchisee would have been given good to excellent reviews by the customer, but suddenly they were removed from an account without notice and without the ability to discuss any complaints with the customer.

214.    All of the aforementioned tactics were used to allow Defendant Simpatico to engage in "churning."

215.    The term "churning" refers to a practice in which the Franchisor does the absolute minimum to comply with its obligations under the Franchise Agreement while forcing the Franchisee to take some action to excuse any non-performance by the Franchisor.  Once that occurs, Franchisor can remove an existing Franchisee from an account and place a new Franchisee in that account.  The same scheme is used with the new Franchisee and the cycle continues.  The scheme allows the Franchisor to sell as many franchises as it can even though there are not enough accounts to support the new and/or existing Franchisees.  It is a basic pyramid scheme that continues because many of the Franchisees lack sophistication and basic language skills to take remedial action along with the complex legal action and expense required to pursue such legal action on an individual basis.

Paragraphs 244 through 254 contain specific allegations as to the omission by the

Stratus system of information concerning the existence of Master Franchisees:

244.    Stratus maintains several domain names on the internet.  These include www.stratusbuildingsolutions.com and www.stratusclean.com.  All lead to the same website.  That website contains testimonials from Unit Franchisees in several areas of the country.  Those testimonials, intended to entice potential Franchisees, contain absolutely no reference to the existence of a Master Franchisee.  (See Exhibit "10")

245.    The Stratus website contains information about Dennis Jarrett, the CEO, and Pete Frese, the President and COO.  In glowing terms, these men are referred to as the founders of the system that has received many accolades.  There is no mention of the existence of the Master Franchisees.  (See Exhibit "11")

246.    The Stratus website actually contains a page referred to as "Accolades."  While that page contains several references to rankings for Stratus, it makes no mention of the existence of the Master Franchisees.  (See Exhibit "12")

247.    Stratus holds itself out as the Franchisor and makes it appear that it is the entity responsible for all Unit Franchisees.

248.    The 2011 Master Franchise Disclosure Document of Stratus Franchising, indicated that there were 39 Master Franchises within the United States.

249.    Unit franchisees, such as Plaintiffs, are given Franchise Disclosure Documents ("FDD") from the Master Franchise in charge of the geographic

region where the unit franchisee is located.  (A copy of the FDD provided to Plaintiff Carmona is attached hereto as Exhibit "13")

250.    The FDD of the Master Franchise is approved by Stratus and is almost identical to the FDD Defendant Simpatico provides to its Unit Franchisees.

251.    The FDD provided by the Master Franchise to the Unit Franchisee contains financial information of the Master Franchise, but also contains the financial information of Stratus Franchising, LLC.

252.     The FDD makes it clear that the Unit Franchisee is being given a license to use the marks and intellectual property of Stratus as a sub-licensee.

253.    Stratus purposely makes the system appear as if it is in total control so that potential franchisees are misled into believing that they will be purchasing a franchise that is part of a huge system of over 5,000 franchises.

254.    After the potential franchisee is in the system, they learn that if they have a problem, it is the Master Franchisee who has apparent control.

Paragraphs 272 through 287 contain specific references as to the misrepresentations made

by Stratus Franchising in its FDD which were provided to potential Master Franchisees:

272.    Stratus Franchising, LLC, misrepresents and omits matters of material fact in Item 1 of its FDD.

273.    Stratus Franchising, LLC, creates an illusion that it and its predecessor first started offering franchises for sale in 2005.

274.    Stratus Franchising, LLC, failed to disclose that Simpatico, Inc., its wholly-owned Master Franchise located in St. Louis, Missouri, had, in fact, previously been a master franchise of Jan-Pro Franchising, LLC, a competitor in the market place.

275.     The aforesaid fraudulent misrepresentation made it appear that Stratus and its wholly-owned subsidiary had started from scratch when, in reality, it had sold franchises under the Jan-Pro umbrella and had simply transferred those existing franchise agreement to the new company.

276.    Stratus Franchising, LLC, violated the provisions in Item 2 of the FDD when it disclosed that JARRETT had previously served as president of Jan-Pro International from 2001 through 2004.

277.    A review of the Jan-Pro disclosure documents, publicly available through its registration with the State of California, reveals that JARRETT had never risen above the office of vice-president of master development.

278.    Said violation was undertaken for the sole purpose of misleading and defrauding potential Master Franchisees.

279.    Stratus Franchising, LLC, violated Item 19 of the FTC rule in that its officers and agents made earnings and profitability claims to potential master franchisees.

280.    For example, Defendants JARRETT, FRESE, and BILL BLAIR, made numerous misrepresentations to Goldeneye Holdings, Inc., (Goldeneye), its Master Franchisee in Orange County, California, prior to and at the time the franchise agreement was signed concerning the expected profits.

281.    In such conversations, Defendant Stratus Franchising, LLC, and its representatives consistently stated that the projected new business generation for each of its salespersons would be $15,588 a month.

282.    After signing the Master Franchise Agreement, Goldeneye received financial information that directly contradicted the aforementioned financial projections.

283.    Specifically, on Monday January 5, 2009 at approximately 9:15 a.m., in the training conference room of SBS located in St. Louis, Missouri, Goldeneye was presented with a sales manual that indicated anticipated new monthly billings would be $9,100.

284.    Such financial performance claims were made to each of the Master Franchises for the sole purpose of inducing them to enter Master Franchise Agreements. Item 20

285.    Stratus Franchising, LLC, violated the FTC rule with regard to Item 20 of the FDD in that it failed to disclose that certain franchise locations contained in the FDD were closed or had never opened.  In addition, Item 20 failed to disclose the existence of certain previous Master Franchisees such as a master in Minnesota and Northern New Jersey.

286.    These misrepresentations were made to every potential Master Franchisee at the time the FDD was forwarded through the mail or by wire.

287.    The aforesaid misrepresentations were made for the sole purpose of preventing potential franchisees from contacting dissatisfied former franchisees.

Paragraphs 288 through 300 set forth specific allegations as to the manner in which

Stratus misrepresented the true structure of its System to publications it knew would publicize

such falsehoods:

288.    Entrepreneur magazine is a monthly publication with a circulation in excess of 600,000.

289.    Each year, Entrepreneur publishes a list known as the Franchise 500®, the preeminent list within the franchise arena.

290.    According to Entrepreneur, each year it invites franchisors such as Stratus Franchising, LLC, to submit their FDD's to the publication.

291.    Entrepreneur then uses a proprietary formula to rank franchises in various categories.

292.    SBS appeared on the list from 2009 through 2012.  The actual rankings are as follows:
    a.    Franchise 500®: #12(2012); #20(2011); #13 (2010); and #38(2009)
    b.    Fastest-Growing:  #1(2012); #1(2011); #3(2010); #4(2009)
    c.    Low-Cost:  #2(2012); #5(2011);#5(2010);#7(2009)
    d.    Top New:  #1(2010); #3(2009)
    e.    Top Home-Based:  #2(2012); #6(2011); #4(2010); #6(2009)
    f.    America's Top Global:  #11(2012); #18(2011); #11 (2010); #33 (2009)

293.    Franchisors such as Stratus Franchising, LLC, who appear in the Entrepreneur list utilize such information in marketing their franchises to potential franchisees.

294.    Potential franchisees such as Plaintiffs utilize the Entrepreneur list as part of their due diligence.

295.    For example, in response to a request by the administrator of Unhappyfranchisee.com, Stratus Unit Franchisee Zurab Kvantrishvili, in a comment posted on June 7, 2012, at 9:39 p.m., stated "[B]efore I bought the franchise I researched information everywhere, and one of the reason we paid $17,000 for it was that Entrepreneur ranking.  If Stratus didn't have such a high ranking I would never trusted them with all my life savings.  When I spoke to John Coleman (one of the master Franchisor in Philadelphia Stratus Building Solution) and asked him to return my money back or I would take him to court, he laughed at my face and this is his exact words, 'Please, who's going to believe you?  We are ranked as #1 cleaning franchise by Entrepreneur nationwide.  You will waste more money on the lawyer.'  I really want to believe that Entrepreneur will take Stratus Building Solutions out of their ranking.  Please don't let them scam more hard working people!"

296.    Stratus Franchising, LLC, provided information that indicated it was founded in 2004, had 5,148 locations, and an investment range of $3,450.00 - $57,750.00, all of which was false.

297.    As previously stated, the Stratus Franchising, LLC affiliate began franchising on behalf of Jan-Pro International much earlier than 2004.

298.    On April 2, 2012, just a few months after the 2012 Entrepreneur Franchise 500® list was FRESE, President of Stratus Franchising, LLC, submitted an affidavit in the United States District Court for the Eastern District of Missouri in which he claimed that there "were at least 3,000 franchise agreements" and that "each of these franchise agreements range from $2,700 to $37,600."

299.    The information submitted by Stratus Franchising, LLC, is further misleading in that it makes it appear that it has over 5,000 direct franchisees including a company-owned franchisee, when, in fact, it has less than 40 Master Franchisees.

300.    That Stratus Franchising, LLC, intentionally provided false and misleading information in order to appear on the Franchise 500® in order to increase the sale of Unit Franchises and, thereby, increasing its ill-gotten gains.


Paragraphs 301 through 312 set forth allegations that the Master Franchisees

perpetuated the fraudulent System:

301.    Each of the Master Franchisees entered into franchise agreements with Unit Franchisees.

302.    Each of the Unit Franchise Agreements contained identical language as to Initial Customer Accounts and "Guarantee."

303.    Pursuant to each of the Unit Franchise Agreements, the Master Franchisee guaranteed a certain level of business to the Unit Franchisee depending on the franchise level purchased.

304.    The Master Franchisees knew that there was insufficient business within their market areas to sustain the Unit Franchisees who came into the system.

305.    The Master Franchisees' survival depended on the sale of new unit franchises and not on the ongoing service fees from the cleaning services provided by the Unit Franchisees.

306.    In order to sustain their level of growth, each and every Master Franchisee was required to develop a system, with the express knowledge of Defendants Stratus Franchising LLC, FRESE and JARRETT, that depended on the "churning" of accounts.

307.    That each of the Master Franchisees continued, through the use of the mail and wires, to fraudulently misrepresent the true nature of the "guarantee."

308.    That each of the Master Franchisees knew that they had no intention of providing the accounts guaranteed in the Unit Franchise Agreements and/or sustaining the Unit Franchise Agreements.

309.    Either the Unit Franchisee would never be given adequate cleaning accounts which satisfied the franchise level purchased or, in the rare alternative that sufficient accounts were given to a Unit Franchisee, the Master Franchisees would immediately start removing the Unit Franchisee accounts as soon as that level was achieved.

310.    The sole purpose of such conduct was to perpetuate the fraudulent Stratus Franchise system.

311.    The experiences of the Plaintiffs, as set forth below, clearly reveals that this fraud was engaged in by the Master Franchisees nationwide.

312.    As a result, Plaintiffs and the Class Members were fraudulently induced into investing an aggregate amount in the millions of dollars which allowed the Stratus system to survive.

Paragraphs 391 through 398 set forth allegations as to the fraud perpetrated on the Unit

Franchisees and the effect of such fraud:

391.    SBS solicits new franchisees to enter into unconscionable and burdensome franchise agreements.  It engages in a policy whereby it accepts substantial payments from potential franchisees, in exchange for the right to operate a cleaning/janitorial franchise that SBS knows, or should reasonable know, will in all likelihood fail.

392.    SBS flaunts itself as one of the fastest growing janitorial franchises in the United States.  A continued rapid increase in the number of SBS franchises sold is an important element in SBS's strategy of continuing to experience substantial growth in revenues.

393.    At the same time, SBS was inducing Plaintiffs and other to invest in its franchise system, it concealed the fact that the company was unable to support that system.

394.    SBS's misleading and deceptive franchise agreements purport, among many other things, to give SBS unilateral control over all significant aspects of franchisee operations and to disclaim any responsibility for the effect of SBS's decisions and actions on the franchises' viability.

395.    The terms of the agreements, Operations Manual, and FDDs' are in combination so burdensome of franchisees and so one-sided in favor of SBS that they can only be regarded as unconscionable and unenforceable.  The net effect on SBS franchisees of its approach to franchising is to ensure unconscionably overboard contracts

that purport to circumvent meaningful legal rights belonging to the franchisee, impenetrable systematic barriers to economic success for the franchisee, and negative incentives to pursue legal remedies to redress injuries caused by SBS's conduct.

396.    Once the franchisees are ensnared in SBS's scheme, SBS defrauds them through the churning cycle, erroneous and excessive fees, and failure to comply with the Master Franchisees' obligations under the Unit Franchise Agreements.

397.    SBS creates an environment where franchisees and their invested capital are preyed upon as the most important, immediate and dependable source of revenue and cash flow for the franchisor, with little concern demonstrated by the franchisor regarding the franchisees' positive cash flow.

398.    Moreover, once the franchisees become aware of this fraudulent scheme, the sunk costs and onerous contractual provisions make it economically prohibitive to escape the SBS franchise agreement, thus finding themselves robbed blind and in a long-term indentured servitude.


"The upshot is that RICO provides a private right of action for treble damages to any person injured in his business or property by reason of the conduct of a qualifying enterprise's affairs through a pattern of acts indictable as mail fraud." *Phoenix, 126 S. Ct. at 2138.*  All of the allegations set forth above clearly refer to a "pattern of racketeering activity."  The allegations are specific and exhaustive.

Rule 9(b) must be read in conjunction with Rule 8, which contemplates simplicity and flexibility in pleading.  *Bale v. Dean Witter Reynolds, Inc. et al., 627 F. Supp. 650 (D. Ct. Minn. 1986).*  If the fraud alleged involved either a course of conduct occurring over an extended period of time or a series of transactions, it is not necessary to recite, in detail, the fact of each transaction of the fraudulent scheme. *Id. (citing General Accident Insurance Co. v. Fidelity and Deposit Company, 598 F. Supp. 1223,1232 (E.D. Pa. 1984).*  Plaintiffs have stated fraud with sufficient particularity to give Defendants more than adequate notice and enable them to prepare responsive pleadings.

In addition, based on the Supreme Courts holding in the *Phoenix* case discussed within, first-party reliance on the alleged misrepresentations is not a requirement to state a cause of action under RICO.  The misrepresentations alleged by Plaintiffs were not necessarily directed to them.  If Plaintiffs are required to the level of specification sought by Defendants, it would render the holding by the Court in *Phoenix* meaningless.

This franchise system consisted of approximately 50 Master Franchisees and anywhere from 3,000 to 5,000 Unit Franchisees.  Plaintiffs allege a system-wide fraudulent scheme. The RICO violations occurred each and every time the mails or wires were used to disseminate the fraudulent information in furtherance of the scheme.  At this stage of litigation, requiring Plaintiffs to specify the date, sender, recipient, or other information for each instance is impossible.  An excellent analysis of Rule 9(b) in the context of RICO allegations in a system-wide franchise fraud case can be seen in *Martzano, et al. v. The Quiznos Franchise Co, LLC, et al., Cause No. 08-0932, (E.D. Pa June 15, 2009). A Copy of that decision is attached hereto as Exhibit A.*

**C.  Plaintiffs have stated causes of action against all Defendants for RICO violations**

In order to establish a RICO case under Section 1962 (c), Plaintiff must demonstrate (1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity. *Atlas Pile Driving Co. v. Dicon Financial Co., 886 F2d 986 (8th Cir 1989) citing Sealima SPRL v. Imrex, Co., 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L.Ed. 2d 346 (1985).*

**1.  Conduct**

Defendants allege that Plaintiffs must set forth two specific predicate acts for each Defendant.  Defendants' position is a misstatement of the law.  Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise…to conduct, participate,

directly or indirectly, in the conduct of such enterprise's affairs."  In *Reeves v. Ernst Young, 507 U.S. 170 (1993)*, the United States Supreme Court was presented with the narrow issue of the meaning of that phrase.  After a thorough review of the RICO statute and its legislative history, the Court held that one is not liable under that provision "unless one has participated in the operation or management of the enterprise itself." *Id.*  An enterprise is operated not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management. *Id.*  Liability depends on showing that the Defendants conducted or participated in the conduct of the enterprise's affairs, not just their own.  "RICO liability is not limited to those with primary responsibility for the enterprise's affairs." *Id.*  "RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprises affairs is required. *Id.*

The *Reeves* decision makes it clear that a Defendant may be liable under RICO if they actively participate, directly or indirectly, in the fraudulent scheme.  The "operation or management" test expressed by the Court in *Reeves* requires only that Defendant take some action to further the activities of the enterprise.  The Defendant need not necessarily commit a predicate act to be liable under RICO.  Plaintiffs have alleged that each of the individual Defendants participated in the enterprise either as owners of the corporate Defendants or as management and/or operational support.

### 2.  Of An Enterprise

Plaintiffs allege that the Stratus system is an association-in-fact enterprise under RICO. An association-in-fact enterprise must have at least three structural features: a purpose, relationship among those associated with the enterprise, and longevity sufficient to permit the associates to pursue the enterprises purpose. *Boyle v. United States, 129 S. Ct. 2237, 2244*

*(2009)*.  Stratus Franchising is a separate and distinct entity from each of its Master Franchises just as each of the Master Franchisees are separate and distinct entities from each other. Defendants attempt to portray Stratus, the corporation, and its own corporate officers, former and current Master Franchisees as a single corporate entity.  However, all Master Franchise agreements clearly indicate that Master Franchisees are independent from the Franchisor.  The association-in-fact in this case is the Stratus franchise system.  It transcends the existence of any single corporate or individual named as a Defendant.  *Boyle* clarified the concept of "association-in-fact."  Plaintiffs have sufficiently pleaded the existence of an enterprise.

### 3.  Through a Pattern of Racketeering Activity

In order to prove a pattern of racketeering activity, "a Plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J., Inc. v.Northwestern Bell Tel. Co., 109 S. Ct. 2893, 2900 (1989).* "Conduct forms a pattern, if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.*  "Continuity" refers to either a closed period of repeated conduct, or to past conduct that by its nature into the future with a threat of repetition.  *Id. at 2901.*

The predicate acts alleged by Plaintiffs occurred each time a fraudulent FDD was forwarded by mail or wire and each time fraudulent information was disseminated into the public domain through the internet or by publication.   All of the actions shared a common purpose of fraudulently inducing Unit Franchisees to sign a Franchise agreement.  All of these actions were similar in that they were directed to immigrants, minorities and others in a lower socio-economic

class.  The methods of commission were similar.  Overall, there are more than a sufficient number of related predicate acts to establish a concrete pattern of behavior of the enterprises.

As far as continuity, the United State Supreme Court has stated that it is "centrally a temporal concept."  The Court must look at the length of time during which the conduct occurred. *Atlas Pile Driving Co., 886 F. 2d at 994*.  This fraudulent system first began in 2004. The scheme continued once Stratus Franchising began offering Master Franchises in 2006.  The fraudulent system remains in operation.  This is "not sporadic activity," *Sedima, 105 S. Ct. at 3285n.14*, nor is it the type of conduct occurring "over a few weeks or months," *H.J. Inc., 109 S. Ct. at 2902.*  While there is no set period of time that is necessary to fulfill the continuity requirement, Plaintiffs would submit that conduct occurring over a nine year period is sufficient. *See Atlas Pile Driving, 886 F 2d at 994 (Conduct lasting over a period of three years sufficient to show continuity).*  Plaintiffs' Complaint alleges sufficient predicate acts continuing over an extended period of time to indicate a pattern of racketeering activity.

Conclusion

The specific and detailed factual allegations contained in the Complaint clearly set forth a pattern of fraud that permeates the Stratus franchise system.  The goal of that fraud was to induce potential Unit Franchisees to sign the franchise agreement.  The mail and wires were used to further the fraudulent scheme.  Plaintiffs' Complaint states causes of action against all Defendants.

WHEREFORE, for the foregoing reasons, this Court should overrule Defendants' Joint Motion to Dismiss or, in the alternative, grant Plaintiffs leave to file an amended complaint.

Respectfully submitted,


LAW OFFICE OF JONATHAN E. FORTMAN, LLC


By         /s/ Jonathan E. Fortman_____
               Jonathan E. Fortman #40319MO
               Attorney for Plaintiffs/Putative Class Members
               250 Saint Catherine Street
               Florissant, Missouri  63031
               (314) 522-2312
               (314) 524-1519 Fax
               jef@fortmanlaw.com


     A true and accurate copy of the forgoing has been served upon all parties via the Court's ECF Filing system

                    /s/ Jonathan E. Fortman_____