UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JOSE TORRES, GUADALUPE CLEMENTE, | ) | |
| LUZ WALKER, CHRISTINA BEITER, and | ) | |
| ANTONIO CARMONA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Cause No.:   4:12-cv-02373 CDP |
| | ) | |
| SIMPATICO, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
JOINT MOTION TO COMPEL ARBITRATION**

## I.        INTRODUCTION

Plaintiffs Jose Torres, Guadalupe Clemente, Luz Walker, Christina Beiter and Antonio Carmona (collectively "Plaintiffs") filed suit against an array of individuals and entities related to Stratus Building Solutions (collectively "Defendants") for alleged civil violations under the RICO Act.  Count I alleges that all the Defendants including each of the current and former Master Franchisees constitute an association-in-fact enterprise under 18 U.S.C. §1961(4). Count II alleges a conspiracy among the Defendants to conduct of the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(d).  The named Plaintiffs are former or current Unit Franchisees of four Stratus Master Franchisees and the Complaint seeks class-certification for hundreds of Unit Franchisees across the country.

The parties in this case are mutually bound by a broad arbitration agreement which encompasses the claims and parties in this case and mandates arbitration on an individual, not a class-wide, basis.  Under the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), agreements to arbitrate "shall be valid, irrevocable, and enforceable save upon such grounds as exist at law or

in equity for the revocation of any contract." 9 U.S.C. § 2.  The FAA manifests the strong federal policy favoring arbitration and requires courts to enforce arbitration agreements according to their terms.  *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011). The Supreme Court has instructed that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).  When, as here, it is clear the entire controversy between the parties is subject to mandatory arbitration under the FAA, the Court must dismiss this case and compel arbitration in accordance with the terms of the parties' agreement.

## II.     ARGUMENT

The fact section of Plaintiff's Memorandum in Opposition to Defendants' Motion to Compel Arbitration is over four pages long and includes new allegations and theories which cannot be not reasonably inferred from the Complaint and have little bearing on the present motion. Defendants will not respond to every baseless allegation and reply only to those arguments essential to the decision to compel arbitration.

### A.  The Non-Signatory Stratus Defendants Can Enforce the Arbitration Agreement.

Plaintiffs first contend that the arbitration provision at issue cannot be enforced against the named Defendants in this lawsuit who are not signatories to the Stratus franchise agreement signed by and between the Unit Franchisee and the Master Franchisor in its geographic area (the "Unit Franchise Agreement" or "Agreement") (*See* Doc. 6-1).   These Defendants include Simpatico, Inc. and Stratus Franchising, LLC, the franchisor of Stratus Building Solutions, its Chief Executive Officer Dennis Jarrett and President and Chief Operating Officer Pete Frese (collectively "Stratus Franchising"), as well as current and various former Master Franchisees

who are non-signatories to the named Plaintiffs' Agreements (all non-signatories collectively referred to herein as "Stratus Defendants").

Plaintiffs contend that they have no obligation to arbitrate with non-signatories to the Agreement because "the unit franchisees never agreed to arbitrate their claims against each and every defendant."  (Doc. 21 at 5).  In addition to mixing arbitrability with the class-action waiver, this is a misstatement of the law as non-signatories can enforce an arbitration agreement in appropriate circumstances such as this case.

In determining whether a non-signatory to an arbitration agreement can compel a party to arbitrate, "it matters whether the party resisting arbitration is a signatory or not." *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 799 (8th Cir. 2005) (citations omitted).  In *CD Partners,* the Eighth Circuit discussed the circumstances under which a non-signatory may compel arbitration by a signatory:

> A nonsignatory can enforce an arbitration clause against a signatory to the agreement in several circumstances. One is when the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided.
>
> Another is when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting [its] claims against the nonsignatory. When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate.

*Id*. at 798 (internal citations omitted) (internal quotation marks omitted).

These two inquiries have subsequently been referred to as the "close-relationship" test and the "intertwined-claims" test.  *See Donaldson Co., Inc. v. Burroughs Diesel, Inc*., 573 F. 3d 578, 583-84 (8th Cir. 2009).  Claims are intertwined not only when they derive from the agreement containing the arbitration provision, but also "where the signatory alleges

'substantially interdependent and concerted misconduct' by the non-signatory and one or more of the signatories." *Id*. at 583.

In this case, the parties are governed by a broad arbitration provision and the Stratus Defendants have a sufficiently close relationship with the Master Franchisors to enforce the terms of their broad arbitration agreements with the Unit Franchisees.  Likewise, Plaintiffs' claims are substantially intertwined as Plaintiffs, signatories to the Unit Franchise Agreements, allege interdependent and concerted misconduct between the signatory Master Franchisees and non-signatory Stratus Defendants.  Accordingly, Defendants have the right to compel arbitration under either of these theories.

1.  **The Arbitration Provision Encompasses all Claims and Parties to This Case and The Relationship Between the Signatory and Non-signatory Defendants Is Sufficiently Close to Compel Arbitration.**

The parties are bound by a broad arbitration agreement which clearly encompasses the claims and parties in this case, and mandates that each arbitration be conducted on an individual, not a class-wide, basis.  The arbitration provision provides in pertinent part:

 **B.  Arbitration**

i.        The parties hereto agree that, except for controversies, disputes, or claims related to or based on improper use of the Marks or in connection with Sections V D or XVII, **all controversies, disputes, or claims between us and our affiliates, and our and their respective members, officers, managers, agents, and/or employees, and you (and/or your owners, managers, guarantors, affiliates, and/or employees)** arising out of or related to:

1.  this Agreement or any other agreement between you and us;

2.  our relationship with you;

3.  the validity of this Agreement or any other agreement between you and us; or

4.  any Stratus System Standard;

must be submitted for binding arbitration, on demand of either party, to the American Arbitration Association . . .

***

iv.      We and you agree that arbitration will be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between us and our affiliates, and our and their respective members, officers, managers, agents, and/or employees, and you (and/or your owners, managers, guarantors, affiliates, and/or employees) may not be consolidated with any other arbitration proceeding between us and any other person.

***

vi.      **The provisions of this Section XXVI are intended to benefit and bind certain third party non-signatories** and will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination.

Doc. 6-1 at 24-25; section XXVI(B) (emphasis added).

While the Unit Franchise Agreements are signed only between the Master Franchisors and the Unit Franchisees, the language in the Unit Franchise Agreement is broad enough to include all individuals and entities related to Stratus and expressly states that the arbitration provisions are intended to bind certain non-signatories.  Indeed, the provision applies not only to the Master Franchisors and their Unit Franchisees individually, but also to the "affiliates," "members," "officers," "managers," "agents," and/or "employees" of both parties.  (Doc. 6-1 at 24; section XXVI(B)(i)).

Plaintiffs attempt to construe language from a non-solicitation clause contained in the Master Franchise Agreements between the Master Franchisor and Stratus Franchising to argue that Stratus Franchising does not consider their Master Franchisors to be "affiliates."  Plaintiffs' argument on this point relies on a faulty premise.  The fact that a different agreement, to which Plaintiffs are not parties, limits the Master Franchisors post-contract from soliciting, among others, "affiliates" of Stratus Franchising, does not inextricably mean that Stratus Franchising cannot be considered an "affiliate" of its own franchisee in a separate and distinct contract.  Likewise, the fact that Stratus Franchising holds its Master Franchisors out as "independent

5

contractors" in the Master Franchise Agreement does not mean that the entities are not "affiliates."  The adjective "affiliated" is defined as "closely associated with another typically in a dependent or subordinate position." Merriam-Webster's Collegiate Dictionary 21 (11th ed. 2003). The verb "affiliate" is defined as "to attach as a member or branch: bring or receive into close connection." Webster's Third New International Dictionary 35 (Merriam-Webster, Inc. 1981).  Common sense dictates that the parties certainly meet these criteria as but for their affiliation with Stratus Franchising, the Master Franchisors would not exist in the first place. The plain and ordinary language of the arbitration provision encompasses the parties to this lawsuit.

In addition to the broad language in the arbitration provision, the relationship between the Master Franchisors, their Unit Franchisees, and the non-signatory Stratus Defendants is sufficiently close that compelling arbitration will further the intent of the signatories to the Unit Franchise Agreement.  Indeed, Plaintiffs' own Complaint repeatedly alleges that the Masters are not only affiliated with Stratus Franchising, but they are acting under Stratus Franchising's direct control.

Plaintiffs allege, among other things, that "a review of the Master Franchise Agreement reveals that, in reality, the Master Franchise is not independent of Stratus and that Stratus retains the right to assert total control over the actions of the Master Franchise." (Doc. 1; Compl. ¶ 230). The Complaint goes on to list provisions in the Master Franchise Agreement which Plaintiffs describe as "the mechanisms of control and influence contained in the Master Franchise Agreements." (Doc. 1 at 90; Compl. ¶ 231). These allegations include that "Stratus maintains the right to bypass the Master and enforce any provision of the Franchise Agreement between the Master and the Unit Franchisee" and that "Stratus requires that all Franchise Agreements

between the Master and the sub-franchisee [Unit Franchisee] contain a provision that Stratus be

identified as a third-party beneficiary of the contract. Stratus inserts itself into the Agreement

between the Master and the sub-franchise in order to alert all parties that it has ultimate control

of the relationship." (Doc. 1 at 90-91; Compl. ¶ 231(a)-(f)).

Thus, Plaintiffs' position here that Stratus Franchising is not "affiliated" with the Master

Franchises is directly contradicted by the allegations in their own Complaint.  In addition to

Plaintiffs allegations regarding the Master Franchise Agreements, there are multiple provisions

in the Unit Franchise Agreements notifying the Unit Franchisees of Stratus Franchising's role in

the Agreement.  The following are just a sample:

- "Franchisor is in the business of offering franchises, and sublicensing the use of the name and service mark of Stratus Franchising, LLC d/b/a Stratus Building Solutions ("Stratus", "SBS")" (Doc. 6-1 at 2);

- "Franchisor has been granted by Stratus the right to offer unit franchises in the Territory (defined below)" (Doc. 6-1 at 2);

- The Unit Franchisees are required to carry certain insurance and "all such policies shall name Franchisor and Stratus Franchising, LLC as additional insured's." (Doc. 6-1 at 15);

- The Unit Franchisees agree "to defend, hold harmless and unconditionally indemnify Franchisor and its shareholders, directors, officers, employees, affiliates, agents and assignees, Stratus and other Stratus franchisees" (Doc. 6-1 at 17);

- "On any termination for cause or expiration of the Master Franchise Agreement between us and Stratus, Stratus has the right, but not the obligation, to assume the rights and obligations of any or all unit franchise agreements." (Doc. 6-1 at 19, 20).

These provisions not only support Stratus Franchising's "affiliation" with the Master

Franchisors, but also demonstrate the close relationship of the parties as set forth contractually to

the Unit Franchisees.  Certainly the parties were put on actual notice that the "certain third party

non-signatories" intended to be bound by the arbitration provision, as expressly stated in Section

XXVI(B)(vi) of the Unit Franchise Agreement, included Stratus Franchising and related Stratus Defendants. (Doc. 6-1 at 25; section XXVI(B)(vi)).

In *CD Partners*, CDWI and C.D. Partners signed franchise agreements containing arbitration clauses. 424 F.3d at 797. C.D. Partners later sued three of CDWI's chief executives for negligence, negligent misrepresentation, and fraudulent misrepresentation in connection with their operation of the franchises. *Id*.  The three executives moved to compel arbitration, and the district court denied their motion. *Id*. at 798. The Eighth Circuit reversed, holding that both circumstances permitting a non-signatory to invoke arbitration were present.  With respect to the parties close relationship, the Court noted that, "[t]he relationship between signatory CDWI and the nonsignatory appellants is a close one. The tort allegations against the three appellants all arise out of their conduct while acting as officers of CDWI.  Evisceration of the underlying arbitration agreement will be avoided only by allowing the three principals to invoke arbitration." *Id*. at 799.

Likewise in *Barton Enterprises, Inc. v. Cardinal Health, Inc*., No. 4:10 CV 324 DDN, 2010 WL 2132744 (ED Mo. May 27, 2010), Barton Enterprises operated a retail pharmacy in Alton, Illinois, and Barton Pharmacies operated a retail pharmacy in Hardin, Illinois.  *Id*. at *1. The Alton pharmacy operated under a licensing agreement with Medicine Shoppe International, Inc. (MSI).  *Id*.  MSI sent a termination letter and accused the Alton pharmacy of breaching the licensing agreement and filed an arbitration claim seeking past-due amounts.  *Id*. Subsequently, Barton Enterprises and Barton Pharmacies reached an agreement to sell both pharmacies to Walgreens.  Thereafter, Cardinal Health, the parent of MSI, contacted Walgreens, and alleged that Barton Enterprises owed MSI $654,206.99 for future license fees on the Alton pharmacy even though there was no mention of these fees in either the termination letter or the arbitration

claim.  *Id*.  As a result, Walgreens refused to honor its agreement to purchase the pharmacies. Barton Enterprises and Barton Pharmacies in turn sued Cardinal Health for tortious interference relating to the sale.  *Id*.

Cardinal Health moved to compel arbitration contending that the terms of the license agreement between MSI and Barton Enterprises required the plaintiffs to submit the lawsuit to arbitration. *Id*. at *2.  In response, Barton Enterprises and Barton Pharmacies countered that there was no agreement to arbitrate as neither Cardinal Health nor Barton Pharmacies were signatories to the licensing agreement. *Id*.  The arbitration clause at issue was substantially similar to the one in this case and mandated arbitration for "all controversies, disputes or claims arising between us and/or our officers, directors, parents, affiliates, agents, employees or attorneys (in their representative capacity) . . . on an individual, not a class-wide, basis."  *Id*.  This Court held that despite being a non-signatory, Cardinal Health could compel arbitration under either of the two theories set forth in *CD Partners*. *Id*. at *3-4.  The Court noted that under the "close-relationship" test, "[r]ejecting Cardinal Health's right to enforce arbitration would eviscerate the agreement in place, particularly given the plain language of the arbitration provision that speaks to disputes with MSI's parents."  *Id*. at *4.

As in CD *Partners* and *Barton Enterprises*, refusing to compel arbitration with the Stratus entities named in this suit would eviscerate the underlying arbitration agreement between the parties.  The Unit Franchise Agreement requires both parties to arbitrate claims relating to the Agreement, its interpretation, the parties' relationship, and any "Stratus System Standard," significantly defined as "company standards, methods and procedures pertaining to the operation of the Franchisee's Franchised Business or this Franchise Agreement." (Doc. 6-1 at 8; section V(B); Doc. 6-1 at 24-25; section XXVI(B)(i)(1)-(4)).  Plaintiffs' claims certainly fall within the

scope of this provision as their entire theory revolves around an alleged conspiracy within the Stratus organization to misrepresent the operation of the Franchisee's Franchised Business. Moreover, the dispute arose from relationships which resulted from the Unit Franchise Agreement. *See Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 382 (5th Cir. 2008) (holding that party to an arbitration agreement could be compelled to arbitrate with a non-signatory where that party had agreed to arbitrate any claim arising from "the relationships which result from th[e] [a]greement.").

The foregoing, coupled with the fact that the Unit Franchise Agreement expressly states that the Unit Franchisees owe certain contractual obligations to Stratus Franchising and that "certain third party non-signatories" are bound by the arbitration provision, leaves little question that the parties intended to arbitrate disputes with all individuals and entities affiliated with Stratus.  Accordingly, the relationship between the Unit Franchisees, Master Franchisors and non-signatory Stratus Defendants is sufficiently close that the broad arbitration agreement must be enforced to all parties in this case.

2. **Plaintiffs' Allegations of Interdependent and Concerted Misconduct Permit the Stratus Defendants to Compel Arbitration under the "Intertwined Claims" or "Alternative Estoppel" Theory.**

The Court may also compel arbitration under an "intertwined-claims" test or "alternative-estoppel" theory as Plaintiffs allege interdependent and concerted misconduct between the signatory Master Franchisors and non-signatory Stratus Defendants.

In *PRM Energy Systems, Inc. v. Primenergy, LLC*, 592 F.3d 830 (8th Cir. 2010), the Eighth Circuit held that a non-signatory to a contract containing an arbitration agreement could require a signatory to arbitrate under certain circumstances. *Id.* at 834. One such circumstance is where the claims against the non-signatory are "so intertwined with the agreement containing the

arbitration clause that it would be unfair to allow the signatory to rely upon the agreement" for the basis of its claims but disallow arbitration of disputes arising under the same agreement. *Id.* at 834–35.   The Court explained that this theory "relies loosely on principles of equitable estoppel, broadly encompasses more than one test for its application, and has been termed 'alternative estoppel.'" *Id*. at 834-35 (*citing CD Partners*, 424 F.3d at 799 ("A willing nonsignatory seeking to arbitrate with a signatory that is unwilling may do so under what has been called an alternative estoppel theory which takes into consideration the relationships of persons, wrongs, and issues ....'")).

In addressing alternative estoppel, the *PRM* court considered whether the party seeking to avoid arbitration was alleging "concerted misconduct" between a signatory of the agreement containing an arbitration provision and a non-signatory. The Court noted that to find sufficient "concerted misconduct," courts must evaluate whether the plaintiff "'specifically allege[s] coordinated behavior between a signatory and a non-signatory."  *Id*. at 835 (*quoting Donaldson Co., Inc. v. Burroughs Diesel, Inc*., 581 F.3d 726, 734 (8th Cir. 2009)). The test for alternative estoppel requires allegations of "pre-arranged collusive behavior" that demonstrates a connection "between [the parties'], wrongs, and issues necessary to compel arbitration." *Id*. at 835–36 (internal citations omitted).

In *PRM Energy*, PRM had a contract with Primenergy that granted Primenergy a license to use some of PRM's technology and also allowed Primenergy to enter into sublicense agreements with third parties. 592 F.3d at 832. The contract contained an arbitration clause. *Id*. Primenergy allegedly conspired with a third party, the Japan-based company Kobe Steel, to violate the terms of that contract. *Id*. More specifically, although the contract specified Primenergy could not sublicense PRM's technology to companies in Japan, Primenergy and

Kobe Steel allegedly entered into such a sublicense agreement. *Id*.  PRM brought suit against non-signatory Kobe Steel for tortious interference and conspiracy, and Kobe Steel moved to compel arbitration. *Id*. at 833. The district court granted Kobe Steel's motion on the basis of equitable estoppel, and the Eighth Circuit affirmed.

The Eighth Circuit explained: "PRM 'specifically allege[d] coordinated behavior between a signatory and a nonsignatory' . . . This is not a situation . . . where the nonsignatory co-conspirator "is a complete stranger to the plaintiffs' ... agreements[,] ... did not sign them, ... is not mentioned in them, and ... performs no function whatsoever relating to their operation." *Id*. (*quoting Ross v. Am. Express Co*., 547 F.3d 137, 148 (2d Cir. 2008)).  The Court concluded that, "we agree with the district court's conclusion that 'PRM's claims either make reference to or presume the existence of the [sublicense agreement], and allege substantially interdependent and concerted misconduct by both the nonsignatory [Kobe Steel] and one or more of the signatories [Primenergy] to the contract.' Accordingly, the district court did not err in its reliance on a concerted-misconduct theory of alternative estoppel to grant nonsignatory Kobe Steel's motion to compel arbitration." *Id*. at 836.

In this case, the requirements for alternative estoppel allowing Defendants to compel arbitration are present.  As in *PRM Energy*, Plaintiffs here allege concerted-misconduct between the signatory and non-signatory Defendants and make little effort to distinguish claims between the two in their Complaint.  Moreover, as in *PRM*, this is not a situation where the non-signatory Defendants are "complete strangers" to the parties' agreement.  In fact, the parties expressly agreed that the arbitration provisions "are intended to benefit and bind certain third party non-signatories" who could only be reasonably identified as the Stratus Defendants.

Furthermore, throughout their Complaint, Plaintiffs make allegations against "SBS" which they define as "the web of affiliated companies, corporations, limited liabilities, franchisor, master franchisees, and their employees, representatives, and/or agents, that, acting together or separately, control and/or manage and/or assist the business of the Stratus Building Solutions franchise system." (Complaint, ¶ 181). This broad definition certainly includes the non-signatory Stratus Defendants. Examples of other allegations include:

- The structure of the enterprise is imposed by the Master Franchise Agreements and the Unit Franchise Agreements. (Doc. 1 at 120; Compl. ¶ 415);

- Defendant Stratus Franchising, LLC, and each of the Master Franchisees, and each and every individual defendant, participated in the conduct of the enterprise through inducing the purchase of franchises by plaintiffs and all members of the class, by knowingly disseminating false and fraudulent information contained within the franchise disclosure documents, the franchise agreements and other publicly available resources. (Doc. 1 at 120-121; Compl. ¶ 419);

- The acts of racketeering activity committed by all Defendants have the same victims, including Plaintiffs and all other Class Members. (Doc. 1 at 121; Compl. ¶ 427);

- The Stratus system, including each and every current and former Master Franchisee, constitute an association-in-fact enterprise under 18 U.S.C. §1961(4) in that: (a) there is a common and/or shared purpose among the members; (b) there is continuity of structure and personnel; and (c) there is an ascertainable structure distinct from that inherent in the pattern of racketeering. (Doc. 1 at 122; Compl. ¶ 431);

- As set forth in Count I, Defendants agreed and conspired to violate 18 U.S.C. §1962(d). Specifically, Defendants engaged in a willful pattern and practice of misrepresenting the Stratus system in order to fraudulently induce Plaintiffs and Members of the Class into entering Unit Franchise Agreements. (Doc. 1 at 123; Compl. ¶ 435).

These allegations, among many others, specifically allege conspiratorial and "coordinated behavior between a signatory and [the] non-signatory" defendants. *PRM Energy Systems,* 592 F.3d at 835. Multiple circuit courts have found this sufficient to compel arbitration under an "intertwined claims" or "alternative estoppel" theory. *See, e.g., MS Dealer Service Corp. v.*

*Franklin*, 177 F.3d 942, 948 (11th Cir. 1999) (plaintiff was estopped from avoiding arbitration with non-signatory where plaintiff's claims alleged a conspiracy by the non-signatory and signatory to defraud plaintiff which were "based on the same facts and are inherently inseparable."); *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005) ("Having alleged in this RICO action that the Deutsche Bank and BDO defendants acted in concert to defraud plaintiffs, . . . plaintiffs cannot now escape the consequences of those allegations by arguing that the Deutsche Bank and BDO defendants lack the requisite close relationship [for non-signatory Deutsche Bank to enforce an arbitration agreement signed by the BDO defendants]").[1]

In light of Plaintiffs' allegations of concerted misconduct, excluding the Stratus Defendants from arbitration would render the parties' agreement meaningless and "the federal policy in favor of arbitration effectively thwarted." *MS Dealer*, 177 F.3d at 947.  Accordingly, Defendants can compel arbitration under the "intertwined claims" or "alternative estoppel" claims theory as recognized by this Court and the Eighth Circuit.

## B. The Arbitration Agreement is Not Unconscionable and Must be Enforced as Written.

The arbitration provision contained in the Unit Franchise Agreement is not unconscionable and a self-serving affidavit by Plaintiffs' counsel with scattered references to unrelated arbitration costs does not bolster Plaintiffs' claim to the contrary.

The Eighth Circuit has addressed the circumstances that an arbitration agreement can be deemed unconscionable under Missouri law:  "Before a contract will be deemed unenforceable on the grounds of unconscionability, a court applying Missouri law must find it both procedurally and substantively unconscionable. *Cicle v. Chase Bank USA*, 583 F.3d 549, 554

---

[1] *See also Grigson v. Creative Artists Agency LLC*, 210 F.3d 524, 528 (5th Cir. 2000) ("[a signatory] cannot on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but on the other hand, deny the arbitration provision's applicability because the defendant is a non-signatory"); *Donaldson Co. v. Burroughs Diesel, Inc*., 581 F.3d 726, 734-36 (8th Cir. 2009) (collecting cases).

(8th Cir. 2009) (*citing Whitney v. Alltel Commc'ns, Inc.*, 173 S.W.3d 300, 308 (Mo. Ct. App. 2005)).  Missouri cases suggest that the two aspects should be considered together and balanced, so "that if there exists gross procedural unconscionability then not much be needed by way of substantive unconscionability" and vice versa.  *Id*.  Procedural unconscionability deals with the formalities of making the contract, while substantive unconscionability deals with the terms of the contract itself.  *Vincent v. Schneider*, 194 S.W.3d 853, 858 (Mo. banc 2006).  The court must "look at the totality of the circumstances on an objective basis, considering the reasonable expectations of the average person entering into such an agreement." *Cicle*, 583 F.3d at 554 (*citing Whitney*, 173 S.W.3d at 310).

Plaintiffs argue that the arbitration agreement is unconscionable for three reasons: (1) the costs of arbitration are prohibitively expensive because the arbitration provision adopts the American Arbitration Association ("AAA") rules which require that the arbitration claimant pay the initial filing fee and other pre-hearing fees upfront; (2) the prevailing party clause in the agreement would subject the claimant to the "prospect of additional astronomical costs should they not prevail;" and (3) the arbitration provision waives any right or claim to punitive or exemplary damages arguably in violation of RICO.  Plaintiffs offer no assessment as to whether these factors render the agreement procedurally or substantively unconscionable.  Under either theory, however, these provisions do not render the agreement unenforceable.

Plaintiffs contend that the average claim among class members is less than $10,000 and each Plaintiff and the members of the putative class would be expected to pay a filing fee of $775 to demand arbitration pursuant to the AAA rules adopted in the agreement.  Plaintiffs argue that "[a]ssuming claimant would be responsible for a deposit of 50% of the arbitrator fees for a projected three-day hearing prior to the hearing, claimants would be expected to pay an

additional amount of $2,250." (Doc. 21 at 11).   Plaintiffs apparently reach this amount by averaging commercial arbitrator rates from markets in Illinois, Colorado, Ohio and Indiana (where no named Plaintiffs owned a franchise).[2]  The "projected three-day hearing" assumption seemingly comes out of thin air as Plaintiffs' own exhibits show that the median length of hearings for commercials claims under $75,000 is one day. (*See* Doc. 21-2 at 16).  Nevertheless, according to Plaintiffs, these costs, combined with other non-specific "pre-hearing" fees, "clearly indicate[] that the costs of arbitration would exceed the average loss of individual members of the class." (Doc. 21 at 11-12).

Plaintiffs' argument again relies on a number of faulty assumptions.  As a preliminary matter, the Unit Franchise Agreement provides that prior to arbitration, either party may "submit the controversy or claim to non-binding mediation" before the Center for Public Resources or AAA.  (Doc. 6-1 at 24; section XXVI(A)).  AAA Rule M-17 provides that: "There is no filing fee to initiate a mediation or a fee to request the AAA to invite parties to mediate."   Had Plaintiffs participated in mediation per the terms of the Agreement, the parties may have been able to reach an agreement to settle the underlying dispute or allocate future arbitration costs without Plaintiffs ever having to pay an upfront fee.  Of course Plaintiffs neither commenced mediation nor responded to Defendants' offer to mediate and front the costs of mediation after suit was filed. (*See* Doc. 6-2).

In addition, AAA Rule R-49 provides that "The filing fee shall be advanced by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce

---

[2] Plaintiffs' counsel simply copied these numbers from a University of Michigan Law Review article and then attempts to hold himself out as having personal knowledge of such fees by referencing them in an affidavit. Significantly, Plaintiffs fail to cite the lower-end numbers included in the article which show that arbitrators in those given markets can cost as little as $600-$750 per day.

the administrative fees."  As such, even if the claimant is required to front the filing fee, the arbitrator has the discretion to apportion it among the parties at a later time.  Moreover, if the Plaintiff truly cannot afford the filing fee, he or she can apply for a hardship waiver or pursue alternative arbitration payment options.[3]

Perhaps of greater significance, the arbitration provision in the Unit Franchise Agreement expressly provides that: "The arbitrator has the right to award or include in his or her award any relief which he or she deems proper, including, without limitation, money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief, and attorneys' fees and costs[.]"  (Doc. 6-1 at 25; section XXVI(ii)).  Therefore, even assuming Plaintiffs' projected cost-analysis and three-day hearing length is accurate, the arbitrator has ultimate discretion of allocating the costs and expenses of arbitration after hearing all the facts of the case.  If a Plaintiff is confident in her case, she can certainly take the position in arbitration that she should not be liable for any of the costs or expenses associated with initiating her claim.

When arguing that arbitration is "prohibitively expensive" and thus unconscionable, the claimant must provide specific evidence of each individual Plaintiff's inability to pay arbitration fees.  In *Faber v. Menard, Inc*., 367 F.3d 1048 (8th Cir. 2004), the Eighth Circuit stated that "[t]he party seeking to avoid arbitration should present specific evidence of likely arbitrators' fees and its financial ability to pay those fees so that the court can determine whether the arbitral forum is accessible to the party. If the party does not meet its burden, the district court must honor the arbitration agreement and compel arbitration." *Id*. at 1054.  *See also Green Tree Fin. Corp.-Al. v. Randolph*, 531 U.S. 79, 90 & n. 6, 91 (2000) (holding plaintiff's unsupported

---

[3] AAA Rule O-8 provides that a "flexible fee" filing fee schedule is also available if the parties wish to pay less upfront which offers an initial filing fee of just $400 for claims under $10,000.  AAA also offers rules and procedures for consumer disputes which cap the claimant's filing fee at $200. *See* AAA Rule C-8. Defendants would certainly be amenable to adopting these rules should the individual Plaintiffs wish to pursue state law breach of contract or tort claims.

assertion of "high" costs and her inability to pay them made the risk that arbitration would be cost-prohibitive for plaintiff "too speculative to justify the invalidation of an arbitration agreement"); *Cicle*, 583 F.3d at 556 ("the record does not support the court's conclusion that the costs and fees associated with arbitration of [plaintiff's] individual claim make the agreement unconscionable as to her."). This Court has adopted a similar burden. In *Kenner v. Career Educ. Corp.*, this Court held:

> The party seeking to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, bears the burden of showing the likelihood of incurring such costs. *Cicle*, 583 F.3d at 556 (citation omitted). Here, Plaintiff has provided no evidence to the Court of her current income, and no evidence to support her contention that arbitration costs will be prohibitive. Indeed, the arbitration clause itself grants the arbitrator the ability to determine how the fees and costs of the arbitration ultimately shall be borne. Thus, the Court cannot conclude that the arbitration clause is unconscionable on this basis.

No. 4:11CV00997, 2011 WL 5966922, at *4 (E.D. Mo. Nov. 29, 2011).[4]

Likewise here, even taking Plaintiff's cost analysis as true, the affidavit of Plaintiffs' counsel does not provide any evidence of his clients' current income or any other evidence demonstrating each Plaintiff's inability to pay for the costs of arbitration. Furthermore, as in *Kenner*, the arbitration clause itself grants arbitrator the ability to determine how the fees and costs of the arbitration ultimately shall be borne. Accordingly, the arbitration provisions cannot be deemed unconscionable because Plaintiffs have failed to meet their burden of proving arbitration would be prohibitively expensive as to them individually.

Plaintiffs' second argument, that the agreement is unconscionable because a prevailing party clause would subject the claimant to the "prospect of additional astronomical costs should

---

[4] *See also Chisholm v. Career Educ. Corp.*, No. 4:11–CV–0994, 2011 WL 5524552, at * 2 (E.D. Mo. Nov. 14, 2011) (holding that "[t]he Court is unpersuaded by Plaintiff's position that the Arbitration Clause in the Enrollment Agreement is unconscionable. With regard to her argument that arbitration would be "prohibitively expensive," Plaintiff has failed to present 'specific evidence of likely arbitrator's fees and [her] financial ability to pay those fees.'").

they not prevail," also must fail.  Section XXVI(D) of the Unit Franchise Agreement provides that "if either party is required to enforce this Agreement in a judicial or other legal proceeding, the party prevailing in such proceeding shall be entitled to reimbursement of its costs and expenses, including reasonable accounting fees, expert witness fees and legal fees." (Doc. 6-1 at 26; section XXVI(D)) (emphasis added).  Plaintiffs did not bring this action to enforce the Unit Franchise Agreement.  As such, the prevailing party clause has no applicability in this case and Section XXVI(ii) of the Agreement granting the arbitrator full-discretion as to fees and costs allocation still controls.

Plaintiffs' final argument is that Section XXVI(F) of the Unit Franchise Agreement renders the arbitration agreement unenforceable because it requires that the Unit Franchisee "waive to the full extent permitted by law, any right or claim to punitive or exemplary damages" in violation of RICO's treble damages provisions. (Doc. 6-1 at 26; section XXVI(F)). Having considered this argument multiple times on prior occasions, this Court and the Eighth Circuit have unanimously rejected Plaintiffs' position and concluded that a waiver of punitive damages alone cannot invalidate an otherwise enforceable arbitration agreement.

In *Larry's United Super, Inc. v. Werries*, 253 F.3d 1083 (8th Cir. 2001), the Eighth Circuit recognized that "[a] court compelling arbitration should decide only such issues as are essential to defining the nature of the forum in which a dispute will be decided."  *Id*. at 1085-86. As such, in the context of a RICO claim, the court held that "[w]hether a prospective waiver of punitive damages violates the public policy underlying RICO's treble damages provision is a matter for the arbitrators in the first instance when fashioning an appropriate remedy if a RICO claim is proven to the arbitrators' satisfaction . . ." *Id*. at 1086.

In *Kenner,* this Court held that "Plaintiff's position that the preclusion of punitive damages and attorney's fees makes the entire arbitration clause unconscionable also fails, as the validity of these provisions are to be determined by the arbitrator." *Kenner*, 2011 WL 5966922, at *4. *See also Arkcom Digital Corp. v. Xerox Corp*., 289 F.3d 536, 539 (8th Cir. 2002); *KCMS Contracting, Inc. v. Triage Mgmt. Servs., Inc*., 2010 WL 2008844, at *2 (W.D.Mo. May 18, 2010); *Grossman v. Thoroughbred Ford, Inc*., 297 S.W.3d 918, 924 (Mo. Ct. App. 2009) ("The remedial provisions of the arbitration clause are not essential to the remainder of the arbitration agreement and may be severable upon a more specific showing of unconscionability. Thus, even if an arbitrator or the circuit court subsequently found any of the remedial provisions invalid, those provisions would not impact the enforceability of the agreement to arbitrate.").

Furthermore, the Master Franchisors' Franchise Disclosure Document ("FDD") provided to all Unit Franchisees expressly informs them of their requirement to mediate and arbitrate all disputes prior to entering into a franchise agreement. Per the FTC Rules, the Unit Franchisees are given a copy of the FDD to read, review, and consider for at least 14 days prior to signing a franchise agreement.  A copy of Plaintiff Carmona's FDD is attached to the Complaint as Exhibit 13 and provides in pertinent part:

- This Disclosure Document summarizes certain provisions of your franchise agreement and other information in plain English.  Read this Disclosure Document and all accompanying agreements carefully.  You must receive this Disclosure Document at least 14 calendar days before you sign a binding agreement with, or make any payment to, Stratus Houston or an affiliate in connection with the proposed franchise sale. (Doc. 1-21 at 1);

- C.   THE FRANCHISE AGREEMENT REQUIRES YOU TO RESOLVE DISPUTES WITH US BY ARBITRATION ONLY IN THE STATE OF TEXAS. OUT OF STATE ARBITRATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST MORE TO ARBITRATE WITH US IN TEXAS THAN IN YOUR HOME STATE. (Doc. 1-21 at 3);

- ▪ E. THE FRANCHISE AGREEMENT REQUIRES THAT ALL DISPUTES, CONTROVERSIES AND CLAIMS OF ANY KIND ARISING OUT OF OR RELATED TO THE FRANCHISE AGREEMENT BE FIRST SUBMITTED TO NON-BINDING MEDIATION PRIOR TO ARBITRATION. (Doc. 1-21 at 3).

That an agreement to arbitration would be included in the Unit Franchise Agreements was clearly made aware to potential franchisees in capitalized type prior to their decision to sign the contract. Additionally, potential franchisees also receive a copy of the Unit Franchise Agreement to review and consider as an exhibit to the FDD prior to signing.[5]  Missouri courts have described an unconscionable agreement as one in which 'no man in his senses and not under delusion would make, on the one hand, and as no honest and fair man would accept on the other,' or one where there is 'an inequality so strong, gross, and manifest that it must be impossible to state it to one with common sense without producing an exclamation at the inequality of it.'" *Cicle*, 583 F.3d at 554 (*quoting Pleasants v. Am. Express Co.*, 541 F.3d 853, 857 (8th Cir. 2008)).  The arbitration provision before this Court is a standard agreement that is not rendered unconscionable by any of the theories set forth by Plaintiffs.  Accordingly, the arbitration provision must be enforced according to its terms.

### III.   CONCLUSION

For the foregoing reasons, the arbitration provision and class-action waiver clause contained in Plaintiffs' Unit Franchise Agreements are valid, irrevocable, and may be enforced by both the signatory and non-signatory Stratus Defendants in this case.   Accordingly, Defendants respectfully request that this Court dismiss the instant action, or alternatively, stay the case pursuant to the FAA, and compel individual arbitrations of the parties in accordance with the plain language of the Unit Franchise Agreements.

---

[5] Exhibit 13 to the Complaint (Doc. 1-21) is not a complete FDD given by Master Franchisors to potential franchisees.

Respectfully submitted,

HEPLERBROOM LLC

/s/ Glenn E. Davis
Glenn E. Davis          #30308MO
J. Austin Moore         #64040MO
211 N. Broadway, Ste. 2700
St. Louis, MO 63102
(314) 241-6160
(314) 241-6116 Facsimile
Glenn.Davis@heplerbroom.com
Austin.Moore@heplerbroom.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 17th day of May, 2013, a true and correct copy of the foregoing document was served via the Court's CM/ECF system upon the following counsel of record:

*Attorneys for Plaintiffs:*
Jonathan E. Fortman
LAW OFFICE OF JONATHAN E. FORTMAN, LLC
10 Strecker Road, Suite 1150
Ellisville, MO 63011
Phone: (314) 522-2312
Fax: (314) 524-1519
E-mail: jef@fortmanlaw.com

/s/ Glenn E. Davis